In Re Roth For our third patent case this morning, we'll expect you gentlemen to present a particularly meaty case. I suspect that the subject matter here is going to be refreshingly similar. You may proceed. Thank you, Your Honor. May it please the Court. What I'd like to do with our brief time here this morning is to discuss a couple of issues that I think are really critical to this case. The first issue is an issue I see all the time in my practice, and that is the issue of generalizing a reference. The opinion below... But your language is so broad. Your language in your claim is ground meat. That's pretty general. You're referring to the claim at issue here. Yeah, yeah. Absolutely. No, it's a meat product. It's a meat product. Now, that would include ground beef, wouldn't it? Absolutely. And so, if you're treating the surface of ground beef, little granules of ground beef, some of that's going to be in the middle of the ground beef, right? I think you're referring to the point that the Board made that since Roth teaches that it's appropriate to treat the surface of ground meat, then it would be appropriate to use an injection needle to inject treatment material into the middle of a mass of ground meat. I think that's the bulk. You're right on. What's the answer? The problem with that is there is absolutely no evidence in the record, not a shred, that one of ordinary skill in the art would have used a needle to inject into ground meat. Why would you do that? You have ground meat. You can mix it around. The way you treat the surfaces of ground meat is the way Roth did. You add material and mix it up. So the problem with that position by the Board is there's really not a shred of evidence that supports the notion that one of ordinary skill in the art would have used a needle to inject into a mass of ground meat. That rationale for combining Roth and the injection references Townsend and Langen, it lacks substantial evidence. It lacks any evidence. At least I don't see it. But doesn't Roth teach that it's best to absorb the ammonia-oxygen mix into the entire product? You're referring to the prior art Roth. I am talking about the prior art. Column 2 of the prior art Roth. Yeah, Roth is both. I like to call that one the 759 reference, but I'll call it Roth here. That gets actually to my first point, the point that I wanted to make about generalizing a reference. Again, I see this all the time in my practice. But the rule is that they're supposed to read these references for all they teach? Absolutely. Doesn't the rules of the law require them to generalize? There's got to be a limit to that. There has to be a limit to that. If you have a reference that teaches an elephant, can you say that it teaches a giraffe? That's a silly example, but there has to be a limit to how far you can generalize a reference. In this case, the opinion below rests almost entirely upon the notion that Roth, the prior art Roth, discloses that it is, I think the term is desirable, discloses that it is desirable to absorb ammonia into meat generally, generally, and increase the pH in the meat generally. They read that generally. The problem is, and I'm familiar with the Roth reference. I wrote that. It is perfectly and entirely concerned with treatment at the surface. So the proper way to read that reference, I think a person of ordinary skill in art reading that reference, they have to read it that it's desirable to absorb ammonia at the surface of the meat. But why did you say absorb into? There's no question. When we say absorb. The prior art Roth says absorb into. Into. There's no question that when you treat the meat, it is. But that's not surface anymore. When you go into something, you're not really on the surface. It's still at the surface. Remember, what we're doing here is we're looking at how one of ordinary skill in the art would have read this reference. Sure, it's, you know, to tell you the truth, I don't know how far it penetrated. A millimeter? Is that a necessary determination? No, it's not. Not at all. The board has one sentence that I think you have to at least challenge and reach the opposite conclusion. It says we determine that one of ordinary skill would have realized that one way to ensure the pH increasing material of Roth is absorbed into the meat product would be to deliver the same onto the interior of the meat product. That's a classic example. Absorbed into the meat product. Again, Roth teaches absorbing it into the meat product at the surface. Roth is a surface treatment. In fact, it's extremely important in Roth that it be a surface treatment, which gets into another issue that I want to talk about a little later. Why? Because Roth clearly teaches, and it's not the only one. There's a prior reference to Hines that is at JA 119, I think, that says when you treat meat with ammonia, and we're talking about these are all surface treatments, all the priority is surface treatments. When you treat meat with ammonia, you have to limit the contact time. If you don't limit the contact time with the ammonia, it damages the meat. Actually, it's discussed more thoroughly in the Hines reference. Not too surprisingly, if you leave it in contact with ammonia too long, the meat starts smelling like ammonia, which is undesirable. Ammonia, that's what makes smelling salts work. No one wants a product where they open it up and get a whiff of smelling salts. That's extremely important. In fact, I can tell you that the whole idea behind the Roth patent, the whole idea was to be able to apply the ammonia in a short time. The way he did it was this, it's totally obsolete now, but the pump system that's disclosed in that reference, where you basically have this little injection port on the intake side of the pump. You squirt the ammonia in there. You use a pump to compress it. They were using 3,000 to 4,000 psi. That's what they wanted to use. Compress it at very high pressure, and then release it quickly. That high pressure allowed them to get the pH change they wanted, but allowed them to get the ammonia off the meat quickly. As soon as they got the pH they wanted, they would put it in a vat, mix it around, and let the excess ammonia come off. When you inject ammonia into steak, it's in there. The idea to me, this is a problem I've had with this case the entire time. The idea to me, and granted my knowledge of Roth is kind of jaded because I know more about it. The idea that Roth somehow suggests that you can inject ammonia into the interior of a meat product, it's crazy. I have to say that the idea that you can do this at all is still crazy to me. Remember, they're combining Roth with injection devices. It's an obviousness. They're not saying Roth teaches the whole thing. They're saying they can pick up the injection device from something else. But they're relying on Roth for the proposition that it's appropriate to put ammonia into the interior of a meat product. They're just relying on the injection devices. Those are curing. They use that to cure. But they say absorbed into. I'm sorry? It doesn't say injected into.  You're referring now to the Roth. To the Roth. Their determination of what Roth is being used for, as Judge Rader points out, in combination with the other two. I agree. Again, that gets back to, I think, we get so mixed up in the tests and the elements. Is there evidence of a motivation to combine or a teaching or a suggestion or a common sense reason? For combining? I'm not sure. I try to avoid that terminology these days. I don't think you should. I understand. I would say it is relegated to a back seat these days. I would say that. But anyway, I'm sorry. Not in the Federal Circuit. Would you please tell me whether there's a TSM to combine? A teaching suggestion or motivation to combine. Or any common sense reason. Flexibly applied. You're talking about the injection references with Roth. Which is what they have to do to have obviousness. Absolutely not. Anyone looking at Roth with its teaching that you have to control the contact time with the meat would say it would be crazy to inject it into the interior. So you're saying it teaches away from it? Exactly. I don't like to use the concept of teaching away. And that's why in the briefs I've always said dissuading one of ordinary skill in the art to combine these references. Teaching away, and that was purposeful. The reason I'm into my rebuttal time, but I'll take just a couple seconds if that's okay. Teaching away has, I think, been relegated in the precedent to rebuttal evidence. Mostly. And in this case, the teaching away evidence is right in the prior art being combined. That and the Heinz reference. So I don't see that it's in the rebuttal. It seems to me it's got to be part of the analysis as to whether there is an apparent reason in the prior art to combine. And so that's why, but you're right. This is a teaching way, and that evidence is very, very powerful. And the office didn't consider it really at all. And I think that's legal error that they didn't consider. Thank you, Mr. Culbertson. Mr. McManus. May it please the court. Claim one is a conceptual claim. It is broad. All it requires is that you inject materials into meat. It doesn't say, it defines the materials and it divides. Inject though. Correct. Where has anything been injected in meat or suggested that it be injected into meat in prior art? Well, if you start with the needles, for example, Langen and Townsend teaches. Yeah, but both of those are injecting fluids. Correct. So those are just needles. They're certainly not injecting anything into meat products. Well, no, they're actually specifically for meat products, for desirable materials. So if you want something into meat, brine is their term, but brine is generally anything that's in meat. So if you want to inject something into meat, use our needles. Roth's prior art pat teaches that his gas, which he also teaches can be a liquid, when you deliver it to the meat, works only by being absorbed into the meat. You can't ignore that his pH-increasing material does not work if it does not get into the meat. Now, Roth's prior art patent teaches the way he's – if you think of the surface, there's a lot of debate here about surface, that term surface is defined in Roth's prior art patent in a very particular way. We can't ignore the definition that, at least in the example of ground meat, it includes the inside of the ground meat product, and ground meat is a meat product. That's all that Claim 1 requires. But we have to come – Well, when it says the interior of the meat product, does that mean the interior of each granule of the ground beef or ground meat, or does it mean just the interior of the mound of ground beef? The specification of that claim on appeal here doesn't define it. If you look at the way surface is defined in Roth's prior art patent, the interior of the ground meat product in that definition would be sort of – if you think of ground meat, there's a long book, Ground Meat. What he's trying to say is surface is just the part you can see. The problem is the definition of the prior art Roth patent includes the stuff you can't. Any surface – well, let's – But the prior art Roth patent always is talking about surface, surface, surface. Right, but using his definition of surface, which includes, quote, generally – this is at A79, column 2, about line 18 – generally any surface that may be exposed to the pH increase in gas. The board correctly read that to say, at least in the example given, for what in surface – But the whole point of Roth prior art is to stop contamination at the surface. That's where E. coli forms. You have to have oxygen for these bacteria to live, so they're all going to be on the surface. And that's what they're treating. They're trying to treat bacteria that might be on the surface. They're not talking about the inside of the meat where no bacteria lives anyway. Well, a couple of responses, Your Honor. First, the benefit that Roth teaches to his inducing or adding his pH-increasing material to the meat includes the microbe-killing aspect, but it also includes improving the color. And if you read the spec on appeal here, that's the benefit he's trying to achieve by injecting the material directly into the meat as opposed to letting the meat draw it in itself. So once you reach the conclusion that color is a desirable characteristic, and there's no evidence that it is not, this is what the board was saying. Look, in order to get that benefit, instead of letting the meat absorb the material into – I'll cut to the chase. I'm going to put it right into the meat. Now, remember, claim one doesn't say so far down into the meat. It just says into the interior. You're putting a lot of weight on the ground meat product surface being somewhat in the center, but would you ever inject into something with a needle into the middle of a ground meat product? Wouldn't that scatter the beef patty? Would you put a needle in there and blow air? Well, again, the material can be a liquid, so if you think of sort of injecting it into the meat, it will sort of disperse out. There's no evidence here that this is a violent application of the needles, and in fact, if you look at Langan and Townsend, it teaches that one of – at least it's Townsend that teaches one of the advantages of his needle is you can sort of control how much you put in, where you put it in, how often you put it in. All these variables which sort of gets to this teaching away argument. There's no evidence that one of ordinary schooling art did not appreciate that there were these things you wanted to avoid. No one teaches that you can't put it directly into – Where's the teaching suggestion, motivation, common sense, reason to combine? Well, it has to do with, again, if you look at Roth, when he teaches how he gets his increase in the pH and thus those desirable characteristics that flow from it. You have to get this stuff into the meat. And the reason, if you look at, for example, at A81, column 5, starting at about line 38 through 53, he says, here's how it works. And what happens is the pH increasing material reacts with free moisture in the meat to create – it's ammonia, it's his preferred pH increasing material, creates ammonia hydroxide. The free hydroxyl ions raise the pH. So really the limiting reagent there in terms of how far it gets down or how it works is how much moisture is there to react with it and how much material you do impart to it. So by using needles as opposed to sort of taking my meat, applying it, and letting so much soak in, which is actually why the Roth-Briar patent teaches a removal step, because theoretically in order to ensure adequate absorption, I'm going to have to over-douse it, so I need to get it off. By using the needles, I avoid that problem because I control how much gets into the meat to get my beneficial characteristics. That's why the board said the motivation here is I cut out all of those other things that I will no longer need because I ensure adequate absorption by putting it directly into the meat. If there are no further questions, I'll yield the remainder of my time. Thank you, Mr. McManus. Mr. Colbertson, you have three and a half minutes. I want to come back very briefly to this notion of ground meat and the definition of surface in the prior Roth patent. I absolutely embrace that definition. Yes, the surface could be the surface of a piece of ground meat in a mass of ground meat, but that doesn't solve our case here because, again, there's just not a shred of evidence that you would use a needle to inject into a mass of ground meat, no matter how careful you were to treat that surface. The prior art is always going to show, all the prior art that I've ever seen, shows that when you want to treat the surface of ground meat, you apply the material and mix the material up. You can do that. So I wanted to address that. And the other thing that I wanted to address is this notion that somehow... Well, let me just read very quickly the passage that... The only finding that is on point regarding the teaching away argument, that I think is critical, the teaching away argument is critical in this case. It is from the examiner's answer, and it is, although Roth discloses the desirability of removing excess treatment gas from the meat surface as Appellant contends on page 7 of the brief, such removal would not be necessary for treatment fluid injected below the meat surface since the meat pourers would absorb all the treatment fluid and thus there would be no excess treatment fluid to be removed. Excess treatment fluid is only a problem with meat surface treatment. The problem with that statement is there is no evidence to support that statement. That's just made up out of clear blue sky. So I don't see how you can negate very powerful teaching away evidence with this statement that is totally unsupported in the record. The last thing that I wanted to point out is even today, after ammonia injection is commercialized, even today they don't really realize and don't really understand how you can do it without damaging the meat. So after all this experience with it, I would say that putting yourself back, which is always our goal, to put ourselves back in time. Mr. Kobleson, with the obviousness at stake, did you provide any secondary considerations? Briefly, we did. I submitted evidence that injection and ammonia surface treatments had been co-existent for over 40 years prior to this invention. I submitted that because I think that that is sort of telling. If this was obvious, how could these have co-existed for 40 years without someone coming up with it? And the board, I see I'm out of time, shall I go on? Finish your statement, please. The board treated that as long-felt need and we didn't show a nexus and we didn't show this, we didn't show that, but I don't think they really addressed that evidence. I think that's pertinent evidence. It is to me. It is to the inventor. Final statement for us, Mr. Kobleson? That's it. Although I would urge the board to reverse the opinion of the board appeal and to direct them to allow the case. Thank you.